NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| JONATHAN DAVEY, | : | Civ. Action No. 22-2254 (RMB) |
|  | : |  |
| Petitioner | : |  |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| WARDEN LAMINE N'DIAYE, | : |  |
|  | : |  |
| Respondent. | : |  |

**BUMB, Chief United States District Judge**

This matter comes before the Court upon Petitioner Jonathan Davey's ("Petitioner") petition for a writ of habeas corpus ("Petition") under 28 U.S.C. § 2241, arguing the Federal Bureau of Prisons ("BOP") violated his Eighth Amendment rights by subjecting him to conditions that put his future health at risk and by denying his application for home confinement. (Petition, Dkt. No. 1.) For relief, Petitioner seeks release from incarceration to home confinement.[1] Respondent filed an answer in opposition to habeas relief. (Answer, Dkt. No. 8.) Petitioner submitted a reply brief.  (ECF No. 9.) For the reasons set forth below, the Court denies the petition for writ of habeas corpus.

---

[1] The Court previously denied Petitioner's request for an *ex parte* temporary restraining order because he did not meet the requirements and construed his request as one for preliminary injunctive relief. (*See* ECF No. 2.)

## I.    **RELEVANT BACKGROUND**

A jury convicted Petitioner of conspiracy to commit securities fraud,18 U.S.C. § 371, conspiracy to commit wire fraud, § 1349, conspiracy to commit money laundering, § 1956(h), and tax evasion, 26 U.S.C. § 7201 and 18 U.S.C. § 2. (*See United States v. Davey*, 12-cr-68 (W.D.N.C.), ECF No. 174 (jury verdict).) The sentencing court sentenced Petitioner to 252 months of imprisonment and ordered him to pay more than $21 million in restitution. (*See id.*, ECF No. 263 (judgment).) Petitioner is scheduled to be released on December 5, 2031. (Declaration of James Reiser ("Reiser Decl."), Attach. J.)

BOP houses Petitioner at FCI Fort Dix. (*See id.*) "FCI Fort Dix is a "low security federal correctional institution with an adjacent minimum security satellite camp[,]" and "FCI Fort Dix Low is made up of buildings formerly used as military training and housing." (*Id.* ¶ 14.) "The Low security institution has an East and West Compound, separated by razor wire fencing." (*Id.*) "Each individual housing unit is a dormitory-style military barrack." (*Id.*) The exact capacity of FCI Fort Dix and the number of inmates that BOP houses there fluctuates. The low facility has a capacity of approximately 4,050 inmates, but currently there are 3907 inmates. [2]  FCI Fort Dix's minimum securities camp is located outside of the fenced-in Low facility.

---

[2] Current information on the number of inmates at FCI Fort Dix is available on the BOP website. *See* https://www.bop.gov/locations/institutions/ftd/ (last visited March 7, 2023). At the time Respondent submitted the Answer, the population at Fort Dix was 3016 inmates. (Reiser Decl. ¶ 14.)

(Reiser Decl. ¶ 14.)  The Camp has a capacity of approximately 400 inmates but currently has a population of approximately 264.[3]

BOP placed Petitioner at FCI Fort Dix in accordance with 18 U.S.C. § 3621(b). Under this statute, BOP has the discretion to "designate the place of the prisoner's imprisonment" at "any available penal or correctional facility that meets minimum standards of health and habitability established by [BOP]" after considering numerous factors, such as the nature of the offense, the characteristics of the inmate, and any statement by the court that imposed the sentence. *See* § 3621(b)(1)-(5). In addition to these statutory factors, Petitioner's placement at FCI Fort Dix is governed by a fact-specific and individualized assessment called a "security designation and custody classification."[4] A custody classification is based on "[t]he level of security and supervision the inmate requires," and "[t]he inmate's program needs, i.e., substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc." *Id.*, Ch. 1 at 1.

Petitioner's case manager at FCI Fort Dix previously reviewed Petitioner's eligibility for home confinement under 18 U.S.C. § 3624. Home confinement is a type of "prerelease custody" currently available to certain inmates with a "low" or

---

[3] *See* https://www.bop.gov/locations/institutions/ftd/ (last visited March 7, 2023).

[4] *See* BOP Program Statement No. 5100.08, Inmate Security Designation & Custody Classification at 1, https://www.bop.gov/policy/progstat/5100_008.pdf (last visited March 9, 2023).

"minimum" PATTERN score[5] that have served 50% or more of their sentence or have 18 months or less remaining on their sentence." (*See* Reiser Decl. ¶¶ 45, 48); *see also* 18 U.S.C. § 3624(g)(2). However, Petitioner's case manager determined that Petitioner was ineligible under "current guidance" because he has served only 35% of his imposed sentence and 41% of his statutory term. (Reiser Decl. ¶ 49 and Attach. J.)

## II. **DISCUSSION**

### a. **The Petition**

On April 18, 2022, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241.[6] (ECF No. 1, Petition.) Petitioner alleges in his Petition that the BOP considers him at "elevated risk of serious illness with respect to covid-19" (*id.* at 6), but he provides no details about his high-risk factors. He alleges that "he is not a healthy man, and certainly not healthy enough to withstand continuous covid-19 attacks." (*Id.* at 6.) He further alleges that he has contracted COVID-19 "twice, but only testing positive once because there was no test the first round." (*Id.* at 7.) Petitioner is also somewhat vague about his vaccination status (*see id.* at 6-7),

---

[5] BOP calculates a PATTERN score based on at least 15 different "risk items." *See* PATTERN Risk Assessment, https://www.bop.gov/inmates/fsa/pattern.jsp (last visited March 9, 2023).

[6] Respondent states that the current Acting Warden of FCI Fort Dix is Stevie Mr. Knight (ECF No. 8, Answer at 29); this individual is "automatically substituted" as the proper respondent under Fed. R. Civ. P. 25(d).

although Petitioner received the Moderna vaccine for COVID-19 on March 10, April 6, and December 7, 2021. (Reiser Decl. ¶ 51 and Attach L.)

Petitioner also alleges that the BOP "implements medical treatment" every three or six months and that corrections officers do not always refer inmates for medical care when they complain about illness. (Petition at 6-7.) Petitioner also notes the BOP's "history of failed attempts at mitigating" COVID-19 outbreaks. (Petition at 7.)

Petitioner also contends that the BOP policy of requiring an inmate to serve 50% of his sentence violates the Eighth Amendment. (Petition at 4, 7.)  Petitioner further contends that he is not seeking the Court to issue an order transferring to home confinement; rather he is seeking to challenge "the indecision by the BOP" regarding his transfer to home confinement.  (Petition at 4.)

### b.  The Answer

In the Answer, Respondent provides a detailed summary of the protocols and procedures the BOP has implemented to address the COVID-19 pandemic and maintain the health and safety of inmates at FCI Fort Dix, which are set forth below.

### 1.  The "Action Plan" & The "Modified Operations Matrix"

The BOP has coordinated with subject-matter experts at multiple organizations and agencies, including the Centers for Disease Control and Prevention ("CDC"), the Occupational Safety and Health Administration ("OSHA"), the Department of Justice ("DOJ"), and other relevant agencies and organizations. (Reiser Decl. ¶ 8.) In the early days of the pandemic, this coordination

5

resulted in a multi-phased operational plan called the "Action Plan," which has gone through multiple iterations. (*See* Reiser Decl. ¶ 4.a.)

Under the Action Plan, "only limited group gathering was permitted, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access." (*Id.* ¶ 4.b and Attach. A.) BOP also "limited the movement of inmates and detainees among its facilities." (*Id.*) Additionally, all staff and inmates were "issued an appropriate face covering and mandated to wear the face covering when in public areas where social distancing cannot be achieved." (*Id.*)

Regarding quarantining and isolation, "every newly admitted inmate, including inmates transferring between BOP institutions," was "screened and tested for COVID-19 exposure and symptoms." (*Id.* ¶ 4.c and Attach. B.) Newly admitted inmates were then placed in quarantine and were required to have a negative test prior to joining the general inmate population. (*Id.*) "Symptomatic or positive inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation." (*Id.*)

"In areas with sustained community transmission, such as FCI Fort Dix, and at medical centers, all staff were screened, before beginning work each day, for symptoms." (*Id.* ¶ 4.d.) "Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone." (*Id.*) "If a staff member did not register a temperature but exhibited symptoms consistent with COVID-19,

he/she was referred to one of the medical providers at the institution to assess suitability for work that day." (*Id.*)

On August 16, 2021, BOP moved beyond the Action Plan and introduced the "Modified Operations Matrix" to further combat the spread of COVID-19. *Id.* ¶ 5. This new Modified Operations Matrix incorporates parts of the Action Plan described above—such as quarantine and isolation protocols—while adding new health and safety measures and increasing BOP's flexibility to address institution-specific conditions, including at FCI Fort Dix. (*See id.* ¶¶ 5-6.) Stated another way, the "Modified Operations Matrix is an adjustable pandemic response plan for infection prevention procedures and inmate programming and services at any given BOP institution location." (*Id.* ¶ 6 and Attach. E.)

Institutions determine their operational level (Level 1, Level 2, or Level 3) based on two indicators of COVID-19 Risk: the facilities' COVID-19 inmate isolation rate and the COVID-19 community risk of the county where the facility is located.[7] These three indicators, in turn, dictate one of three modified levels of operation for the BOP institution. (*See* Reiser Decl. ¶ 6.)

---

[7] *See* BOP COVID-19 Operational Levels, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited March 7, 2022).  In the Answer, Respondent states that the Modified Operation Matrix adjusted the infection prevention procedures at a particular institution based on <u>three indicators</u> of transmission risk: (1) the rate of COVID-19 inmates in medical isolation; (2) the combined percentage of staff and inmate who are vaccinated; and (3) the transmission rate of the county where the BOP institution is located. *See* Reiser Decl. ¶ 6.

When the BOP filed its answer, FCI Fort Dix was operating at Level 3 Operations. (*Id.* ¶ 12.7) As of July 8, 2022, FCI Fort Dix had four reported staff COVID-19 cases and zero inmate cases. (Reiser Decl. ¶ 25.) Under Level 3, the modifications to operations at FCI Fort Dix are "intense." (Reiser Decl. ¶ 13 and Attach. E.) BOP personnel at FCI Fort Dix must:

- Follow the full COVID-19 Pandemic Plan including facility- wide use of face coverings, surgical or N95 masks as indicated for both inmates and staff.

- Conduct daily COVID-19 symptom screen and temperature check prior to entry into the institution (enhanced screening).

- Have social distancing in all areas of the facility and up to six feet where feasible.

- Utilize cohort systems, the practice of grouping individuals together to confine their care to one area and prevent contact with susceptible individuals, for inmate housing, inmate programming, and the provision of services.

(*Id.*)

"Regarding cleaning protocols, 'high touch' areas must be cleaned several times per day during Level 3 Operations," and "[g]ood hygiene habits are promoted to staff and inmates using a variety of means (e.g., educational programs, campaigns including posters, assessing adherence to hand hygiene practices, etc.)." (*Id.* ¶ 10 and Attach. M.) "Supplies for handwashing (soap, running water, hand dryers or paper towels) are readily available for all staff and inmates and continually restocked as needed." (*Id.*) "And hand sanitizer is available in monitored common areas (but cannot be stored in inmate cells for security reasons)." (*Id.*)

Regarding social distancing, it is required in all areas of FCI Fort Dix under Level 3 Operations, even if six feet of distance is not always possible. (*See id.* ¶¶ 13-15.) However, the "reduced population has allowed for better social distancing at both the Low facility and the Camp." (*Id.* ¶ 15.) Additionally, "inmates generally move throughout the facility in housing-unit assigned cohorts when required to leave their individual housing units for programming needs and to obtain services at this time." (*Id.*)

Currently, FCI Fort Dix is operating under Level 1 Operations.[8] Under all three levels of the Modified Operations Matrix, medical isolation, contact tracing, and appropriate Personal Protective Equipment ("PPE") are required. (Reiser Decl. ¶ 9.) Face coverings "must be worn at all times" by staff members "while indoors regardless of vaccination status." (*Id.*) And "continued high sanitation standards are expected at all levels of operation and at a minimum, all areas, supplies, and equipment must be cleaned on a daily basis." (*Id.*)

### 2. Quarantine & Isolation Procedures

In addition to the Modified Operations Matrix, BOP "has designated quarantine and isolation locations throughout" FCI Fort Dix. (*Id.* ¶ 16.) "Quarantining means separating (in an individual room or cohorting in a unit) asymptomatic not fully vaccinated persons to (1) observe them for symptoms and

---

[8] Updated COVID-19 figures are available on the BOP's website, https://www.bop.gov/coronavirus/index.jsp (last visited March 7, 2023).

signs of the illness during the incubation period and (2) keep them apart from other incarcerated individuals." (*Id.* ¶ 17 and Attach N.) "When transfer quarantine is required, inmates releasing or transferring from the FCI are placed into cohorts and are moved to quarantine spaces at least 21 days prior to their scheduled movement." (*Id.* ¶ 16.) "Camp inmates (minimum security) transferring out of the institution are quarantined in another unit." (*Id.*)

"Isolating means confining individuals with suspected (displaying symptoms) or confirmed (based on a positive point-of-care (POC) or commercial laboratory test) COVID-19 infection, either to single rooms or by cohorting them with other viral infection patients." (*Id.* ¶ 17.) "Additionally, any time an inmate tests positive for COVID-19 in a housing unit, the positive inmate is moved to an isolation unit." (*Id.* ¶ 18.)

"All inmates entering isolation units are tested for the COVID-19 virus using send-out laboratory tests. Before the inmates are released from the isolation unit the inmates are tested again." (*Id.* ¶ 19.) "Inmates in isolation units do not leave their housing units." (*Id.* ¶ 20.) "Staff brings meals and other items, such as Commissary, to the housing units." (*Id.*) "Likewise, inmates in isolation generally receive medication and medical services in those units unless more extensive treatment is necessary." (*Id.*)

"To minimize the risk of contracting and spreading the virus, staff entering any quarantine/isolation building are required to wear proper Personal Protective Equipment ("PPE"), which they obtain from the Lieutenant's office." (*Id.* ¶ 21 and

Attach. F.) "This may include an N-95 mask, face shield/goggles, a gown, and gloves." (*Id.*) "Additionally, symptomatic staff are prohibited from coming to work at the institution and are encouraged to seek treatment from their respective medical providers." (*Id.* ¶ 22.)

### 3.  Testing & Vaccination Program

BOP also combats the spread of COVID-19 through testing and vaccines. Regarding testing, BOP has had testing guidance in place since June 2020 under the Action Plan and has tested 3291 inmates at FCI Fort Dix since May 25, 2022. (*Id.* ¶¶ 4.c., 27 and Attach. B.)

Regarding vaccines, as of May 25, 2022, BOP has offered all eligible staff and inmates the COVID-19 vaccine. (*Id.* ¶ 23.) "BOP views inmates as eligible for vaccination unless medical circumstances counsel against vaccination." (*Id.*) "Newly eligible inmates, new arrivals, and inmates that have previously declined a vaccine will be offered the vaccine as additional supplies are received." (*Id.*) "Additional vaccine supplies are ordered based on anticipated need." (*Id.*)

As of March 8, 2023, BOP has vaccinated 3359 inmates at the institution with complete doses of COVID-19 vaccines. [9] As of the same date, BOP has vaccinated 277 staff at FCI Fort Dix with complete doses of COVID-19 vaccines.[10]

---

[9] *See* https://www.bop.gov/coronavirus/covid19_statistics.html (last visited March 8, 2023). Respondent provided the vaccination rates since July 2022 (Reiser Decl. ¶¶ 24, 26), but the Court has used the updated information, which is available on the BOP COVID-19 Statistics section of the BOP website.

[10] *Id.*

### 4. Prioritizing Home Confinement

In addition to the Operations Matrix and a robust vaccination program, the BOP has prioritized home confinement for at-risk inmates who are non-violent and pose minimal likelihood of recidivism. (*See* Reiser Decl. ¶¶ 31-32 and Attach. G.) In making this determination, "BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:"

- The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

- The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility; and

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home confinement. Other serious offenses weigh heavily against consideration for home confinement.

(*Id.* ¶ 32 and Attach. G.)

While making this fact-specific determination, the Attorney General emphasized that BOP "cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways." (*Id.*, Attach. G. at 2.) Accordingly, any inmate granted home confinement under this guidance was required to be "in a mandatory 14-day quarantine period" before being "discharged from a BOP facility." (*Id.*) "Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release." (*Id.*)

On April 3, 2020, the Attorney General updated the guidance to BOP and issued additional directives in light of the passage of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. (*Id.*, Attach. H.) The CARES Act authorized the Attorney General, at his discretion, "to expand the cohort of inmates who can be considered for home release upon [his] finding that emergency conditions are materially affecting the functioning of [BOP]." (*Id.* at 1.)

Following issuance of the Attorney General's April 3, 2020 guidance, "BOP has greatly increased home confinement since March 2020, and continues to aggressively screen inmates for home confinement" based on the fact-specific factors described above. (*Id.* ¶ 41.) For example, on April 13, 2021, BOP determined that inmates with a "low" (as compared to a "minimum") PATTERN score or "300 or 400 series" incident reports in the past 12 months "may" still be suitable for home

confinement. (*See id.* ¶ 45 and Attach. I at 1-2.) Furthermore, "any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager." (*Id.* ¶ 42.) Given its prioritization of home confinement, BOP currently "has 5,592 inmates on home confinement."[11]

However, consistent with the Attorney General's guidance, home confinement is not considered an appropriate placement for certain inmates, even with BOP's expanded policies. (*See* Reiser Decl., Attach. H.) "That means [BOP] cannot simply release prison populations en masse onto the streets." *Id.* at 2. "Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses." *Id.*

As relevant here, one factor that BOP uses is determining whether an inmate is eligible for home confinement is the percentage of time served. In general, an inmate must serve "50% or more of their sentence; or has 18 months or less remaining on their sentence and have served 25% or more of their sentence." (*Id.*, Attach. I at 2.) "If an inmate does not qualify for home confinement under BOP criteria, he may be reviewed for placement in a Residential Reentry Center and home confinement when he is eligible in accordance with applicable laws and BOP policies." (*Id.* ¶ 46.)

---

[11] *See* https://www.bop.gov/coronavirus/faq.jsp (last visited March 7, 2023). The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 54,229. *See id.*

Moreover, if an inmate is dissatisfied with BOP's home confinement determination, he or she may appeal through BOP's administrative exhaustion procedures. Under BOP's multi-level exhaustion system, an inmate must first "present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy." 28 C.F.R. § 542.13(a).

Second, if the inmate is not satisfied, he may file a "formal written administrative Remedy Request, on the appropriate form (BP-9)," within "20 calendar days following the date on which the basis for the Request occurred." 28 C.F.R. § 542.14(a). Third, if the inmate "is not satisfied with the Warden's response," which must issue within 20 days, the inmate may "submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." §§ 542.15(a), 542.18. Finally, "[a]n inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response." § 542.15(a). The General Counsel has 40 days to respond. § 542.18. If an issue raised by the inmate concerns "an emergency" that "threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing." § 542.18.

### c. Analysis

28 U.S.C. § 2241(c)(3) provides, "[t]he writ of habeas corpus shall not extend

to a prisoner unless-- ... He is in custody in violation of the Constitution or laws or

treaties of the United States...." First, the Court must satisfy itself of jurisdiction.

*Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76–77 (3d Cir. 2003) ("courts have an

independent obligation to satisfy themselves of jurisdiction if it is in doubt.")

### 1.  Jurisdiction over Petitioner's Habeas Claims

Respondent first argues that the Court lacks jurisdiction to order to issue an

order for home confinement under 18 U.S.C.§ 3624(c)(2) or its amendments under

the CARES Act. The Third Circuit has stated that Petitioners cannot use "§ 2241 as

an end-run around the compassionate release statute (18 U.S.C. § 3582(c)(1)(A)) and

the federal CARES Act, which vests in the Director of the Bureau of Prisons

discretion to transfer an inmate to home confinement." *Olson v. Warden Schuylkill

FCI*, No. 21-2436, 2022 WL 260060, at *2 (3d Cir. Jan. 27, 2022); *see also Perri v.

Warden of FCI Fort Dix*, CV 20-13711 (RBK), 2023 WL 314312, at *3 (D.N.J. Jan. 19,

2023) (same).

As noted by Respondent, Congress's decision to grant the Attorney General

and BOP this substantial authority and discretion concerning home confinement

under the CARES Act reflects a long-standing practice of deferring to BOP regarding

the transfer and placement of inmates. Indeed, under 18 U.S.C. § 3621(b), BOP (not

the courts) "shall designate the place of the prisoner's imprisonment" based on an

individualized and fact-intensive analysis of the inmate. "Any order,

recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person." *Id.* Furthermore, "a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.* As a result, the Court agrees with Respondent that it lacks jurisdiction to issue an order for home confinement under 18 U.S.C.§ 3624(c)(2) or its amendments under the CARES Act. *United States v. Aguibi*, 858 F. App'x 485, 486 n.2 (3d Cir. 2021) (citing *Tapia v. United States*, 564 U.S. 319, 331 (2011)) (finding that the BOP has the sole authority to place a prisoner on home confinement); *Washington v. Warden Canaan USP*, 858 F. App'x 35, 36 (3d Cir. 2021) (explaining that the decision "to transfer an inmate to home confinement is ... within the exclusive discretion" of the BOP).

Petitioner contends, however, that the Court has jurisdiction over his Petition because his Eighth Amendment right to avoid cruel and unusual punishment has been violated. As the basis for the Eighth Amendment violations, he contends that 1) he is high risk of serious illness from COVID-19, 2) the BOP had failed to contain outbreaks of COVID-19, and 3) the BOP generally provides inadequate medical care.

Respondent argues that the Court also lacks jurisdiction over Petitioner's Eighth Amendment claims "because Petitioner is challenging the conditions of his confinement concerning the risk of COVID-19, and he does not present a 'core' habeas claim." (ECF No. 8, Answer at 29.)

As this Court recognized in *Goodchild v. Ortiz*, No. CV 21-790 (RMB), 2021 WL 3914300, at *15 (D.N.J. Sept. 1, 2021), the Third Circuit has not yet determined in a precedential decision whether habeas jurisdiction under 28 U.S.C. § 2241 extends to an Eighth Amendment conditions of confinement claim by convicted prisoners based on the threat of COVID-19 infection. In *Hope v. Warden York County Prison*, the Third Circuit held that because extraordinary circumstances existed in March 2020, based on the COVID-19 pandemic, immigration detainees could seek habeas relief and release from confinement under 28 U.S.C. § 2241, based on allegations that the conditions of confinement violated the 14th Amendment. 972 F.3d 310, 324 (3d Cir. 2020). The court noted habeas jurisdiction over conditions of confinement claims are limited to "extreme cases" or "extraordinary circumstances." *Id.* (quoting *Ali v. Gibson*, 572 F.2d 971, 975 n. 8 (3d Cir. 1978)), superseded by statute on other grounds as recognized in *Callwood v. Enos*, 230 F.3d 627, 633 (3d Cir. 2000). The Third Circuit stated,

> as the Supreme Court has instructed: "habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate."
> *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist.*, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).

More recently, in *Olson v. Warden Schuylkill FCI*, No. 21-2436, 2022 WL 260060, at *2 (3d Cir. Jan 27, 2022) (nonprecedential), the Third Circuit relied on *Hope v. Warden* and found that the district court "possessed jurisdiction" over Olson's

petition to the extent he "sought release as redress for allegedly Eighth Amendment-violative conditions of confinement solely through the mechanism of § 2241[.]" (explaining that the district court "had the authority to order a change in Olson's custody if there was a valid basis to do so") (citing *Johnston v. Marsh*, 227 F.2d 528, 529-30 (3d Cir. 1955)).

Here, Respondent contends that the Third Circuit has never extended habeas jurisdiction to convicted inmates challenging conditions of confinement. Respondent further contends that Petitioner's wholly unsupported allegations that he is at risk of dying from COVID-19 despite his status as a fully vaccinated inmate militates against the Court finding that extraordinary circumstances exist, triggering § 2241 jurisdiction. The Court agrees that Petitioner has not sufficiently set forth extraordinary circumstances that would justify exercising habeas jurisdiction over Petitioner's claims under § 2241.[12]

---

[12] As the Court found in its order to answer, Petitioner's allegations about his susceptibility to serious illness from COVID-19 are vague and "unsupported." (*See* ECF No. 2 at 3 ("[Petitioner] draws the unsupported conclusion that if he is infected with COVID-19 again, he 'will not survive.'").)

## 2.  Exhaustion under 28 U.S.C. § 2241

Respondent further contends that even if the Court has jurisdiction over Petitioner's Eighth Amendment claims, Petitioner did not fully exhaust his administrative remedies.[13] The Court agrees.

A federal prisoner ordinarily may not bring a petition for writ of habeas corpus under 28 U.S.C. § 2241 until he has exhausted all available administrative remedies. *See Callwood v. Enos*, 230 F.3d 627, 633-34 (3d Cir. 2000)). "Although there is no statutory exhaustion requirement attached to § 2241, we have consistently applied an exhaustion requirement to claims brought under § 2241." *Callwood*, 230 F.3d at 634. "We require exhaustion for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative

---

[13] Respondent also argues that under the PLRA, an inmate challenging the conditions of his confinement must exhaust all available administrative remedies. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") (emphasis added). Other court have applied the PLRA exhaustion requirement to petitions raising concerns over COVID-19. *See Dimartino v. Sage*, 21-cv-498, 2022 U.S. Dist. LEXIS 6639, at *14 (D. Conn. Jan. 13, 2022) ("[T]he Court concludes that this § 2241 petition [seeking home confinement and challenging conditions of confinement] is subject to the requirements and limitations set forth in the PLRA."); *Alvarez v. Larose*, 445 F. Supp. 3d 861, 866 (S.D. Cal. 2020) (applying PLRA "to a habeas claim based on confinement conditions" because of COVID-19). This Court need not decide this issue as Petitioner's claim fails for lack of prudential exhaustion and on the merits.

autonomy." *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 761-62 (3d Cir. 1996). This prudential exhaustion may only be excused if (1) it would be futile, (2) the actions of the agency clearly and unambiguously violated a statutory or constitutional right, or (3) the administrative remedy process would be clearly inadequate to prevent irreparable harm. *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir. 1988).

The BOP's administrative remedy system has three tiers allowing "an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10(a). Here, Petitioner submitted only a BP-9 grievance on or about May 11, 2022[14] and filed his federal court petition on April 18, 2022 (dated April 5, 2022). (*See* ECF No. 4 at 1; compare ECF No. 1 (petition); *see also* Declaration of Corrie Dobovich ("Dobovich Decl.") ¶ 7 and Attach. A; Reiser Decl. ¶ 50 ("Records do not reflect that Petitioner submitted a request to be considered for Compassionate Release/Reduction in Sentence to the Reduction in Sentence (RIS) Coordinator at FCI Fort Dix to date.").)

Furthermore, Petitioner concedes he failed to exhaust his administrative remedies and instead argues that exhaustion is futile. (*See* Petition, ECF No. 1 at 5-6.) Petitioner argues that the Court should excuse his failure to exhaust and "proceed

---

[14] For reasons that are unclear, Petitioner states that he resubmitted a BOP-9 grievance form on May 11, 2022, but his grievances are dated April 27 and April 29, 2022. (*See* ECF No. 4 at 8-10.) BOP also did not locate this grievance until July 6, 2022. (*See* Dobovich Decl., Attach B at 7.) Nevertheless, there is no dispute that Petitioner failed to fully exhaust his grievance before filing his petition with this Court since Petitioner submitted his grievance at almost the same time as he filed his petition, which would make exhaustion impossible.

to the merits underlying the controversy because the administrative body will not at all entertain his administrative remedy." (*See* Petition, ECF No. 1 at 5-6.) However, Petitioner does not explain why he believes BOP would not "entertain" his grievance. *See id.*

As noted by Respondent, the issues raised in the petition are fact specific, and BOP should be given an opportunity to develop a factual record and address Petitioner's concerns at the administrative level in advance of litigation before the Court. Petitioner's unsupported statements that his grievances would be futile are insufficient to overcome the exhaustion requirement. Thus, the Court finds that the Petition is subject to dismissal for failure to exhaust administrative remedies.

### 3. Merits of Petitioner's Eighth Amendment Claims

Finally, Respondent argues that even assuming that the Court has jurisdiction and can bypass exhaustion and order a change in Petitioner's custody, there is no valid basis to do so here, and the Eighth Amendment claims fail on the merits. The Court agrees.

Notably, Petitioner seeks preliminary injunctive relief. Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. In order to grant preliminary injunctive relief, the Court must assess: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest." *N.J. Retail Merchants Ass'n v. Sidamon-*

*Eristoff*, 669 F.3d 374, 385- 86 (3d Cir. 2012) (internal quotations omitted). "The failure to establish any element ... renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). The movant bears the burden of showing that the four factors weigh in favor of granting the injunction. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

Preliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Novartis Consumer Health, Inc. v. & Johnson– Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). Moreover, where (as here) a petitioner is seeking mandatory injunctive relief disrupting the status quo, he must satisfy a "particularly heavy burden" and show a "substantial" (not just reasonable) likelihood of success on the merits and an "indisputably clear" right to relief. *See Hope*, 972 F.3d at 320.

Here, Petitioner alleges that the BOP was deliberately indifferent to his health and safety, in violation of the Eighth Amendment, because it failed to prevent the spread of COVID-19 at FCI Fort Dix, failed to provide adequate medical care at FCI Fort Dix, and denied his request to be transferred to extended home confinement under the CARES Act.

To demonstrate deliberate indifference regarding medical care under the Eighth Amendment, an inmate must show: (1) that alleged deficiencies in medical care are objectively "sufficiently serious"; and (2) that government actors "have a sufficiently culpable state of mind." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020).

The threat of future harm from disease exposure does not violate the Eighth Amendment unless the threat is so severe that it would be "contrary to current standards of decency for anyone to be so exposed." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). In addition, a plaintiff must also show that BOP "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Here, Petitioner's Eighth Amendment claims lack merit because Petitioner "fails to identify conduct rising to the level of deliberate indifference by his jailors[.]" *Olson*, 2022 WL 260060, at *2 (citing *Hope*, 972 F.3d at 329). Plaintiff has not plausibly alleged or shown any deliberate indifference to his health and safety or his need for medical care by prison officials. Quite the contrary, Respondent has shown without contradiction that the BOP has taken reasonable steps to address the COVID-19 pandemic within Fort Dix.

Moreover, the threat of serious illness to Petitioner is not so severe that it is contrary to current standards of decency.[15] In the civil immigration context under the

---

[15] The Court need not reach the issue of irreparable harm but notes that Petitioner is vaccinated, and the Third Circuit has suggested the "widespread availability of the COVID-19 vaccine" eliminates the "imminent risk of serious physical injury." *See Garrett v. Murphy*, 17 F.4th 419, 433 (3d Cir. 2021) (affirming denial of compassionate release) (quotations and ellipse omitted).

Fifth Amendment, the Third Circuit has held that the specter of COVID-19 infection does not constitute a constitutional violation where the government "increased its efforts to minimize risk by improving hygiene and decreasing exposure. *See Hope*, 972 F.3d at 331. That is exactly what BOP is doing at FCI Fort Dix through the Modified Operations Matrix. BOP has provided substantial evidence showing it is offering vaccination to inmates and staff, quarantining and isolating inmates exposed to COVID-19, promoting the use of personal protective equipment, regularly cleaning the facility, and testing symptomatic inmates. (*See* Reiser Decl. ¶¶ 5-23.)

Under these circumstances Petitioner cannot demonstrate a reasonable probability of success on the merits, much less the substantial likelihood of success required for a mandatory injunction to upend the status quo. For these reasons, Petitioner fails to show that a likelihood of success on the merits, and the Court need not reach the remaining elements for preliminary injunctive relief.

To the extent Petitioner is challenging the merits of BOP's home confinement determination under existing BOP policy, Petitioner's challenge is also without merit. Petitioner's case manager determined that Petitioner was ineligible under "current guidance" because Petitioner has served only 35% of his imposed sentence and 41% of his statutory term. (*See* Reiser Decl. ¶ 49 and Attach. J.) That determination does not violate existing BOP policy, and there is no basis to make an exception for Petitioner under these circumstances. (*See id.* ¶ 50 ("Petitioner was ineligible at that time under the current guidance because he had not served 50% or

more of his sentence; nor did he have 18 months or less remaining on his

sentence.").)

### 4. APA Claims

Finally, Petitioner may be attempting to challenge the BOP's decision to deny

Petitioner home confinement under the Administrative Procedures Act, 5 U.S.C. §

706(2)(A), which provides, in relevant part:

> The reviewing court shall-- ... (2) hold unlawful and set
> aside agency action, findings, and conclusions found to be-
> -(A) arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law.

This provision, however, must be read together with 18 U.S.C. § 3625, which

provides, "[t]he provisions of sections 554 and 555 and 701 through 706 of title 5,

United States Code, do not apply to the making of any determination, decision, or

order under this subchapter." Subchapter C of Title 18 governs §§ 3621-3626. Thus, a

prisoner may not challenge his custody classification under § 706 of the APA.

*Burnam v. Marberry*, 313 F. App'x 455, 456 (3d Cir. 2009) ("Congress has precluded

judicial review of claims made pursuant to § 706) (citing 18 U.S.C. § 3625; *see also*

*Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998)). This Court has previously

held that "[e]xtended home confinement under the CARES Act falls under § 3624(c),

and is thus exempted from judicial review." *Goodchild v. Ortiz*, No. CV 21-790

(RMB), 2021 WL 3914300, at *19 (D.N.J. Sept. 1, 2021); *Shah v. Warden, FCI Fort*

*Dix*, No. CV 22-6306 (RMB), 2023 WL 1794891, at *4 (D.N.J. Feb. 7, 2023) (same);

*see also United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021) ("the recently passed

CARES Act permits the Director of the BOP to extend the period of home confinement permitted under § 3624(c)(2) (citing Pub. L. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020)). Therefore, jurisdiction does not lie in under 5 U.S.C. § 706(2)(A), *see Shah v. Warden*, FCI Fort Dix, 2023 WL 1794891, at *4, and the APA claim is dismissed for lack of jurisdiction.

### III.   **CONCLUSION**

For the reasons discussed above, the Court denies the habeas petition. An appropriate Order follows.

Date: March 20, 2023.

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**CHIEF UNITED STATES DISTRICT JUDGE**